I'm an attorney here in Omaha, and I represent all the appellants in this action. I would like to reserve two minutes for rebuttal. This case was initiated by a freight brokerage company against some of its former employees and the freight brokerage company, a competing one, that those former employees joined. It involves theories of tortious interference, breach of the duty of loyalty, and civil conspiracy. And the case also involves damages, a claim for damages, as well as injunctive relief. It arose here in the Federal District Court for the District of Nebraska. This case was assigned to Judge Lori Smithcamp, and she presided at all phases of the pretrial and trial. Following the filing of the complaint in this action by the plaintiff, the court entered a temporary restraining order against the defendants that turned into a temporary injunction, which lasted for a certain time. Eventually, after that temporary injunction was lifted, the case proceeded to a jury trial on damages. After a jury verdict in favor of the plaintiff for a little over $1.56 million against the defendants, the defendants filed post-trial motions under Rule 50 and Rule 59. The trial court denied those in all respects, and this appeal followed. The standard of review for this court is de novo for reviewing rulings under Rule 50 and abusive discretion for rulings under Rule 59. The facts of this case are set forth in the briefs, but I wanted to highlight a couple of things. And that is that the Appalee CT Freight is a division of West Plains LLC. It is a freight brokerage company. What that means is that it matches shippers of goods with the customers who need those goods shipped. And hopefully, being a middleman, it hopes and expects to make a profit. The appellant, RFG Controls, is also a freight brokerage company in the same business, and that is a matchmaker. It was started by a gentleman named Bryce Wells, also an appellant, and he was a former owner of CT Freight. The remaining appellants are all former employees of CT Freight, the Appalee, and for the most part still remain employed by the RFG Controls appellant. Neither Mr. Wells nor any of the appellants were under any kind of non-compete or non-solicitation agreement when they left the employment of CT Freight. This is a very competitive business. There's 12,000 to 15,000 of these kinds of businesses in the United States. In the case of CT Freight, it had no exclusive relationship, no exclusive contract with any customers. Customers are free to use a variety of freight brokers, and they do. And so a freight broker's customer is potentially every other freight broker's customer. Well, it seems that the e-mails and the instant messages here were probably what the jury relied on in large part. Why is that not enough to show a breach of duty of loyalty? This is not a contract case, like you say, for a restricted covenant. It's just a common law duty of loyalty. Well, with the duty of loyalty, first of all, Judge, there were instant messages and there were e-mails by some of the appellants in this case, and those in all candor were stupid e-mails, stupid instant messages. I know in hindsight that's what happens. That's what makes lawsuits. That's correct, Judge. But in terms of causation, did the fact that some of these employees were talking amongst each other on instant message, did that really result in what the legal standard is for a breach of duty of loyalty? And the legal standard there is it has to substantially hinder the company in the continuation of its business. And the evidence was clear at trial that in December of 2012, the month before these folks left, and January of 2013 were banner months for C.T. Freight in terms of sales. These people were working hard. They may have had some instant messages that were, as I said in candor, were stupid, but the fact is they continued to work hard, they continued to process loads for their employer, and the sales figures showed that they continued to work hard. C.T. Freight was not substantially hindered in the continuation of its business. Well, but the evidence is that this business is a personal relationship between the salesperson and the buyer, the purchaser of these other businesses. So it seems to me the jury can determine, yes, they had a lot of business, they worked hard, because they wanted to maintain that personal relationship and carry it over to a new business instead of just giving them bad treatment in their last days at C.T. Well, that's true, but in doing, you know, in looking out for the customer and doing what's right for the customer, they were benefiting C.T. Freight up until the time that they left. And so in terms of – Well, that might go to damages, but I'm not sure that goes to the duty of loyalty. And again, I think the standard, you know, set forth in the Cudahy case from this district of Nebraska is, you know, did the conduct by the employees substantially hinder the company in the continuations of its business? And while they were employed and while they were writing those instant messages and talking to each other, they were not in a position where the company was substantially hindered because of its record sales and the continuation. But the point was that they were working to move that business, that book of business, the personal relationships to a new company. And, you know, I don't remember if they used the word conspiracy, but at least an organized effort to do that. Well, I never saw in any email, Judge, anything about them using the word conspiracy. No, I'm saying I've used that, but it was an organized effort to a certain degree. But there was no evidence at trial, Judge, that they can talk amongst themselves. They can talk about a new place of employment. They can make plans to leave their current employer and go to another. It's when they start soliciting those customers while they're on the clock of their employer that gets them into trouble under a breach of duty of loyalty claim. And the fact that they made plans, that they looked at new space, that they looked at new fax machines and computers is interesting, but it doesn't rise to the legal level required for a breach of a duty of loyalty. And I will get to the damages point on this a little later. Perhaps you can provide some explanation. I wasn't really sure from looking at the material what the answer to this question is. February 5th, 2013, the employees leave, and the next day many of West Plains' former customers began tendering deliveries to RGC. Just looking at that, that looks a little strange, a little odd, almost like a smoking gun there with such a quick turnaround with respect to these employees and tendering of deliveries. Well, it doesn't take long, Your Honor, to do that, and there was testimony at the trial about that very same thing. What had to happen was, upon going to the new employer, they had to send forms to the customer, the customer had to sign a certain agreement, had to provide credit information, and then that information about the customer was loaded into a computer system, a software program called Strategy. And at that point, then the new company can start taking loads. And during the week from February 5th to February 12th, when the TRO was entered, they processed about 175 loads at RFG. How does that compare to normal before they left? It was low. It was certainly a lot lower than what they had been doing when they worked at CT Freight. Why couldn't the jury just assume, as Judge Shepard said, is that to move and start up a new business, and, I mean, day one of a new business have considerable work. I mean, companies usually don't start up on day one with a lot of business. They have to build it up. So why couldn't the jury just assume that that's evidence of this breach of duty? They must have been organizing this with the customers, with the shippers ahead of time. Well, I guess they could make that assumption, but there was sure no evidence of it. I mean, there was not one customer who the CT Freight called to testify at trial about any kind of improper solicitation prior to those employees leaving CT Freight. There was one customer who testified by deposition from probably the biggest customer, Land O'Lakes, named Kevin Zimsky, and Mr. Zimsky testified that he was not solicited prior to Mr. Needham, in that case, his departure. Is there an issue here I can't remember, trade secrets? Did that go to the jury and say, in other words, the day they left, they had certain information of CT, and the next day they went and they used those trade secrets? There was a claim judged for misappropriation of trade secrets, and the jury found in favor of the defendants on that point because the evidence showed at trial that really in this business there are no trade secrets. For customer information, you can go on the Internet and find out who's in the business of shipping dry goods. So the jury correctly concluded on that. Is that what these employees did? Yes. These employees were able to get the information they needed to process loads and service customers from public sources. So the evidence revealed that they didn't make use of the customer lists and Rolodex and other records that they took with them that they eventually returned? That's right, Your Honor. Their testimony at the trial was that they went on public sources or called those customers. I mean, a lot of these customers, they knew phone numbers off the top of their head. Todd Pizant testified at trial. He's one of the appellants, and he testified at length about how you know these people, and it's not hard to get a hold of them and get the necessary information to input into the new system. So I think that they were able to, within a week's time, have 175 loads that they processed. But there were delays. One of the other, Nestle Purina, was a client, a customer that wasn't able to get set up for three weeks because of corporate paperwork. So it wasn't an immediate thing where they were off and running. But after April 5th, when the court lifted the temporary injunction and said to the appellants, you're free to compete, everything's on a level playing field now, they were successful in getting business and winning business that was formerly held by CT Freight. But that was all proper. It was all fair competition. It was all without any non-competes or non-solicitation clauses in place. Mr. Flood, what was the corporate formulation of RFG, Retzlaff Grain Company? Who were the principals? They've been sued as Inc. What's the formulation there? Mr. Bryce Wells was one of the owners, along with his wife, of Retzlaff Grain. And a DBA was called RFG Controls, which was this freight brokerage business. And they've been sued, and what was the evidence that they were involved here? Well, Mr. Wells was the founder of this new competing freight brokerage business. Yes. Mrs. Wells was not involved. Break the law to formulate a new business, does it? No, it does not. No, it does not, Your Honor. I did want to save some time for rebuttal, but I do want to bring up this one point before I sit down. The injunction here that was entered was the remedy that should have been the end of this case. Because the result of the jury verdict and the court entering judgment consistent with the jury verdict was that not only were my clients put on ice for two months, they also had to pay for the value of a business, and that business continued well into the trial and still continues today. So that's the trifecta, and it's not fair and it should not stand. Thank you. Okay, thank you, Mr. Vaughn. Good morning, Ms. Huebner. Good morning. May it please the court, counsel, my name is Catherine Ditrick Huebner, and I'm here today representing the plaintiff and appellee in this case, West Plains, LLC. Defendant's appeal is based almost entirely on sufficiency of the evidence, and in that type of appeal, he has to show that the evidence was so insufficient that no reasonable jury could reach the conclusion that the jury did in this case. Your complaint was tortious interference with a business relationship. Correct. And that's the tort, so to speak, that we're dealing with here. In addition to breach of duty of loyalty, yes, and conspiracy. Conspiracy involving those other two actions. Exactly. Yes, Your Honor. And would you say what was the second one? Breach of duty of loyalty. Breach of duty and loyalty. Yes. What are the elements of that cause of action? For breach of duty of loyalty, plaintiff's burden was to show that the defendants acted against the interests of West Plains, that they did not act with fairness towards West Plains, that they acted in competition or unfairly took advantage of their position, and that substantially hindered the continuing operations of West Plains. What are the elements of the tortious interference with the business relationship? For that claim, they need to show that there was an expectation of future business, that the defendants knew of that business, that there was an unjustified act and causation and damages. And the unjustified act was the? Breach of duty of loyalty. In addition. So it's part of, it's really interrelated. Exactly. Breach of duty of loyalty supports the other claim. There were also unjustified acts of violating the company handbook, which had policies on confidentiality and conflicts of interest that were also unjustified acts. With those elements in mind, what evidence did you advance against Wells and RFG, which I guess includes his wife? What evidence? The main legal theory by which we can reach Mr. Wells and RFG Logistics was under the conspiracy theory that he played a part in extensive planning to commit an unlawful act, which was to tortiously interfere. What specifically was the evidence of his conspiracy? There were extensive amounts of emails between Wells and the other defendants in this case, one of which they were assessing the strategy of the best way to recruit the rest of the team, the entire team of brokers. Mr. Wells told them not to do some things that they did and so forth, and yet he? That's correct. He did tell them not to do certain things. And that was wrong to tell them not to do things? Well, that wasn't wrong. But under the Professional Business Services v. Rossnow case and the Vigoro Industries v. Crisp case, they make clear that under Nebraska law it is a breach of duty of loyalty to recruit coworkers to join a competitive entity. And there are emails between Bryce Wells and Cindy Schulting where they are strategizing the best way to recruit the whole team. So that's where we get the conspiracy of Wells involved, is that he is participating in that recruitment of the entire team of brokers to be lifted and to move over to West Plains. When I was practicing law, I ran into a young lawyer that did particularly good work, and he was with another law firm, and I said, hey, what do you think about coming over and joining my law firm? I violated the law and visiting with somebody about that. Well, under the Vigoro case and under the Rossnow case, it is a breach of duty of loyalty to recruit those coworkers to lift the entire team to move it over. Now whose loyalty are we attacking here, the new person? Both, essentially, because they all conspired together to recruit the whole team. There's emails, for example, Joint Appendix page 1115 is the email between Cindy Schulting, defendant, and Bryce Wells where they're strategizing how to recruit Todd and Drew. There's emails from Chad Needham, that's on page 1077 of the Joint Appendix, where he is recruiting Drew by saying there will be no CT freight. And that's how they got all the folks to come along. Well, let me back up a minute. I think, as I understand, Mr. Wells, this was his team. He sold the business. Correct. And then started this new business and then tried to recruit the team from his old company that he just sold for $2.5 million. Correct, correct. Was that part of your argument? I mean, just because you sell a business doesn't mean you can't, as Judge Beam says, say, I'd like to take some of those people with me. Right, right. And defense counsel talks extensively about the fact that these are at-will employees and that they did not have non-compete agreements, and that is true in this case. They were free to compete after their resignations, but they didn't set out to do that. They didn't set out to compete. What they set out to do was to lift the entire infrastructure, all of the freight brokers from West Plains, and move it over. And there's testimony from Kevin Zimsky, who is the representative of Land O'Lakes, who was West Plains' biggest customer, that he was responsible for 40,000 to 50,000 loads a year. And his concern was, in order to transfer the business, he had to have assurances that the defendants had an entire infrastructure in place to be able to service those customers. There's also testimony from defense's industry expert that says, the business follows where the team is. Who has the capacity to do the job? Who is this? This is Michael Fouts, who is the industry expert that defense counsel . . . He was the expert witness. Exactly. That was his opinion. That was his opinion. It's on page 1087 of the transcript, where he says the businesses are looking for capacity. Because there's normal attrition. There's normal people who leave and join another company, and they're allowed to do that. But here, the defendants knew that they could only be immediately successful if they lifted all of the freight brokers, all of that capacity to service the customers. Following up on Judge Bean's question, it would have been entirely appropriate, would it not, for Mr. Wells to contact each of these employees individually and offer them positions with his new company? Yes. I believe that would have been lawful for him to do that, but that's not what he did. He contacted a few of them and then conspired about, how are we going to recruit this whole team? And then they began recruiting each other. So the evidence here is that he did not contact each of these individuals. That is correct. That is correct. Most of the recruitment was done by Chad Needham, who was responsible for Land O'Lakes, the biggest customer of West Plains. There's multiple ways by which the jury could find that these individuals breached their duty of loyalty. One was in recruiting their coworkers, which I've already discussed. One was the fact that Tom Danner, his wife Rebecca, Cindy Schulting, and Chad Needham all were paid $5,000 to consult for a competing business while they were still working for West Plains. And those consulting agreements were submitted to the jury. Defendants also planned every aspect of the competitive entity. Page 1117 through 1133 and 1411 through 1422 of the Joint Appendix shows extensive planning emails where all of the defendants are working through everything they need to do to set up this joint entity. They also took advantage of their positions to solicit customers prior to their resignation. And there is no smoking gun on this. There's not an email by which they solicit the customer over email. And quite frankly, that's because there were hundreds of thousands of electronic correspondence between the defendants and West Plains' former customers. They were in touch all day long, and we just simply didn't have the capacity to go through all those files. But what we were able to find were extensive emails where the defendants state their intention to contact customers ahead of time. They're emails from Tom Danner, from Cindy Schulting, from Drew Wagner, with plans to contact the customers. On page 1415 of the Joint Appendix, Tom Danner talks about the fact that they had to contact the customers ahead of time because large companies don't respond quickly to a, quote, name change. That's how he referred to what was happening here. Page 1079 of the Joint Appendix, Drew asks how long it will take to get set up with Lando Lakes. And Chad responds, they will be in place before I leave. There is another exhibit, 1327 of the Joint Appendix, where Chad tells Bryce Wells that he is going up to Lando Lakes. So again, he's working with Bryce Wells on this. He says he's going up in January, and he says, I will be speaking to them about switching to us. He, in fact, does go up there. As defense counsel said, Kevin Zimsky testified that he did not believe he was solicited because he wasn't told the name of the new company. Whether or not he was told the name is irrelevant here. He admits that what he was told was that Chad Needham was leaving. And he also admits that at that point in time, he had a decision to make. He would have had no decision to make had Chad not solicited his business. Most importantly, though, after all this, the evidence of what their plans are to do to solicit these customers, sure enough, right after February 5th, the revenues of West Plains from its top 20 customers plummet for West Plains and skyrocket for RFG. The jury was presented with financial documents to show that. For example, page 2779 of the joint appendix is a comparative document that shows the top 20 customers. It shows the revenue that CT Freight obtained and then the revenue that RFG Logistics changed. And the jury could see that direct correlation. Also, page 2098 and 2103 of the appendix shows that the revenue went from $1.9 million in January to $212,000 in March. Did all these defendants personally testify? Yes. Yes, each one of them did. I assume you cross-examined them. We did, Your Honor. Is there an issue here? I assume they denied a conspiracy, but is there an issue here of credibility here? I assume by the time of closing arguments you had your evidence, the e-mails and so forth, but you had their testimony saying we didn't do that. Yes, there is an issue of credibility because their testimony does say that we did not solicit customers. They basically are stating, yes, we planned to. We planned to solicit the customers ahead of time, but we didn't actually do that. Then you have the testimony from the customer, Kevin Zemsky, who says that he came to Land O'Lakes and told me he was leaving, and then I had to make a decision about what was best for the business. He also testified unequivocally that he needed assurances from the defendants that they had the infrastructure in place to support his business for 40,000 to 50,000 loads a year. Again, there's the industry expert who testified that the business follows who has the capacity to do the work. I want to address quickly defense argument on the effect of the injunction in this case. His claim is that there could be no damages after the expiration of the injunction, and he provides two cases to support that. However, neither of the cases make that holding. In both of the cases, the appellate court states that the jury properly assessed the extent of damages caused by the defendants, and that's the standard here. The jury has to assess the extent of damages caused by the defendants. There is no question that their conduct lasted well beyond the temporary injunction, and if the court were to adopt the rule of law that defense is requesting, it would produce illogical results because it would mean that no plaintiff could ever obtain damages post a temporary restraining order. The plaintiff would be left to decide whether or not to seek a TRO or to seek damages after that. What the jury needed to do was assess the extent of the damages caused by the defendants in this case. What defense counsel is asking this court to do is essentially step in the place of the jury. That's the theme of his argument, to come in here and weigh the evidence, which is not proper for the court to do. I see I'm almost out of time. Unless the court has any other questions, I will thank you for your work on this case. Okay. Thank you very much. Thank you. I've got to ask my curiosity. Is Bill Dittrich your father? He is, yes. Yes. Just curious. Yes, that's correct. Your Honors, I'm not asking the court to put itself in the shoes of the jury. I'm asking it to put itself in the shoes of the trial judge who, at the joint appendix 108 in the order for summary judgment, said that the damages for tortious interference in this case will be considered in conjunction with the court's preliminary injunction order and will be subject to mitigation. But she never did. She was given the opportunity. She knew the effect of the injunction better than the jury did, and she had given specifically these defendants the green light to compete. All that evidence of what happened after April 5th, the business skyrocketing for RFG and going down for CT freight, was the result of lawful competition that this district court sanctioned. And finally, I want to point out, if I can, just briefly wrap up. Thank you. The measure of damages, Your Honor, is something that I would ask this court to please review. This case resulted in a verdict based upon loss of business value, which has never been a theory that's been adopted by the Nebraska Supreme Court in a tortious interference case. The correct measure is lost profits, and there was no evidence of what lost profits CT freight sustained. The court had an opportunity to fix that post-trial and did not. We ask this Eighth Circuit Court to enter judgment as a matter of law for the appellants, or in the alternative, to grant a new trial or to alter and amend the judgment to reduce the damages to zero. Thank you. Okay. Thank you. Thank you both for your presentations today. Interesting case. We will take it under advisement and be back to you in due course.